Filed 6/9/26  S.N. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| S.N.,<br><br>　　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF RIVERSIDE COUNTY,<br><br>　　　　Respondent;<br><br>RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>　　　　Real Party in Interest. | E088172<br><br>(Super.Ct.No. DPSW2500406)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Sean P. Crandell, Judge.  Petition denied.

Lori Kennedy and Suzette Jacobsen for Petitioner.

No appearance for Respondent.

1

Minh C. Tran, County Counsel, Jamila T. Purnell, Chief Assistant County Counsel, and Julie Jarvi, Deputy County Counsel, for Real Party in Interest.

## I.

## INTRODUCTION

S.N., the mother of 10-year-old A.M., petitions under California Rules of Court, rule 8.542 to vacate the juvenile court's order bypassing reunification services and setting a hearing under Welfare and Institutions Code[1] section 366.26.  The court found under section 361.5, subdivision (b)(2), that Mother was incapable of caring for A.M. within the statutory time limits due to her mental disability.  Mother contends there was insufficient evidence to deny her services under section 361.5, subdivision (b)(2), because the court relied on psychological evaluations where it was unclear as to the qualifications of either mental health provider and neither mental health professionals testified or clarified the reasons for their findings.  Mother also argues that granting her reunification services was in the best interest of the child.  The order is supported by substantial evidence.  We deny the petition on its merits.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 29, 2025, the Riverside County Department of Social Services (DPSS) filed a petition on behalf of A.M. pursuant to section 300, subdivisions (b) (failure to protect) and (g) (no provision for support) based on Mother's unresolved

---

[1]  All further statutory references are to the Welfare and Institutions Code.

mental health issues and not being under the care of a doctor. The petition also alleged that Mother has had a prior child welfare history for similar concerns of general neglect due to mental health issues in Riverside County and Los Angeles County and had failed to benefit from services provided. The petition further alleged that Mother was unable and/or unwilling to provide care and support to her child and had stated she could no longer care for him. A first amended petition was filed on January 22, 2026, and a second amended petition was filed on February 26, 2026.

Mother had prior child welfare history in Los Angeles County in 2014 that involved her daughter, A.Z.[2] Mother had been involuntarily hospitalized due to attempting suicide. She had filled the home with carbon monoxide and overdosed on her prescribed medication. Mother was found in a bathtub full of water with the gas on. A.Z. was detained from Mother and released to her father. Mother received 12 months of reunification services while A.Z. was on family maintenance with her father. In 2015, jurisdiction was terminated with the father receiving full physical custody of A.Z. and the parents having joint legal custody. Mother was provided with supervised visitation. In total, Mother had nine prior child welfare allegations against her involving the children.

On November 20, 2025, DPSS received a referral alleging general neglect of A.M. and A.Z. who was 17 years old at the time. It was alleged that A.M. and A.Z. were up at 3:00 a.m. mopping the floor because Mother did not want bugs crawling on her. Mother

_____

[2] A.Z. was not a party to this underlying dependency and is not a part of this writ proceeding. A.Z. and A.M. have different fathers. A.M.'s father is not a party to this writ petition.

3

stated that the home was deplorable and infested with several different insect species that crawled in the family's noses and mouths. A.Z. moved out of Mother's home and was living with a friend and the friend's family.

The social worker met with Mother at her home. Mother allowed the social worker to conduct a home evaluation. Mother stated that she was legally blind and received government benefits. Mother had enough vision to cook and clean. She stated that the apartment had some type of very small bug infestation, and the home needed to be thoroughly cleaned on a regular basis to keep them away. She denied keeping the children up late at night to clean. Mother showed the social worker a small amount of water the size of a teaspoon on the bathroom floor and stated that there were pipe leaks coming from under the floor causing this issue. The property manager, however, denied that there were pipes under the units. Mother had pulled up the rug in the bedroom because she believed there were bugs in it, and she was sleeping in the living room area until new flooring could be installed. The property manager sent pest control to the unit, but they said that there were no signs of bugs in the home. The social worker did not observe any bugs or insects in the home during the visit. The social worker also noted that there was no sign of a leak, or repair of a leak, or wall repair in the bedroom anywhere, and no signs of water damage in the apartment.

On December 23, 2025, DPSS received a second referral after Mother called dispatch stating that she was having issues with A.M. who kept running away from her. Mother asked law enforcement to take A.M. on a "5150 hold" but he did not meet the criteria. Mother believed that A.M. was going through a manic episode due to being

4

undiagnosed with schizophrenia and bipolar disorder. A.M. stated that he defied Mother because she made him do chores which were boring and he wanted to play outside with his friends instead. Because Mother was unable to safely care for A.M., he was taken into law enforcement custody and transferred to the police station.

Mother denied abandoning A.M. and wanted him assessed and medicated so she could care for him appropriately. Mother was told that A.M.'s behavior did not indicate an assessment was needed, but Mother would repeat her belief that the child needed an assessment and psychotropic medication. Mother accused "all persons, from neighbors, to teachers, to the maternal aunt, as acting or colluding against her." She also stated that A.M. was trying to make her crazy because he threw fits, screamed and yelled. Mother denied a mental health history for herself and denied being prescribed medications for any diagnoses.

After the social worker obtained custody of A.M. from law enforcement, A.M. informed the social worker that he did not want to return to his mother and indicated that he would run away if returned to her. A.M. indicated that he was "okay" being placed in foster care and repeatedly stated that he did not want to return to his mother. A.M. was well-behaved and obedient, and he took direction with ease and without resentment. The social worker spoke with a maternal aunt. The maternal aunt reported that the mother had long-standing mental health issues. The maternal aunt was not surprised that A.M. had behavioral issues after A.Z. left the home because the maternal aunt said that A.Z. was A.M.'s primary caregiver due to Mother's lack of mental health stability. A.M. was placed in the maternal aunt's care.

At the December 30, 2025, detention hearing, the juvenile court formally detained A.M. from parental custody.

A.M.'s father was eventually located. The paternal aunt had power of attorney for him for several years. According to the paternal aunt, Father had been diagnosed with " 'acute schizophrenia' " since the age of 20. The paternal aunt took care of all of Father's needs including medical issues and appointments. He had never seen A.M., and DNA testing showed that he was A.M.'s biological father.

On January 8, 2025, the social worker interviewed A.M. A.M. was polite and articulate and did not appear guarded. He stated that he had never seen any bugs, and it was Mother who told him there were bugs. He was not aware of any water leaks in the home. He admitted that he had stated that he was going to kill himself while living with Mother. He explained that he was in a bad place and out of control and that he no longer wanted to harm himself. He wanted to stay at his maternal aunt and uncle's home and did not want to go home with Mother. The maternal aunt expressed that she had concerns regarding phone calls between A.M. and Mother. A.M. continuously stated that he did not want to speak with Mother and would refuse to speak with her and hang up on her sometimes.

On January 16, 2026, A.M. underwent a psychological evaluation with Dr. Kenneth Garett. Dr. Garett found that A.M. met the criteria for post-traumatic stress disorder. A.M. disclosed that his mother physically and emotionally abused him and that he wished to have no contact with Mother. Based on his evaluation, Dr. Garett recommended the court order that there be no contact between A.M. and his mother at

6

that time. Dr. Garett also found that A.M. was behind in school, had learning difficulties, and recommended A.M. be placed a special education program.

The juvenile court found that visitation between Mother and A.M. was detrimental and denied Mother visitation. Over her counsel's objections, the juvenile court authorized two psychological evaluations for Mother. Mother's counsel also informed the court that they may be requesting a Guardian ad Litem for Mother.

On February 26, 2026, Mother's counsel requested that a Guardian ad Litem be appointed for Mother. The court granted the request.

Mother underwent two psychological evaluations. The first was conducted by Dr. Garett, a licensed psychologist. Dr. Garett provided probable diagnoses of Delusional Disorder, Bipolar 1 Disorder, and possible attention deficit disorder with hyperactivity when Mother was younger. Dr. Garett opined that offering reunification services to Mother at that time would not be appropriate as services may "further agitate her given that she is not presently in a position to regain custody" and she had not fully acknowledged the nature or severity of her mental health difficulties. Dr. Garett later clarified that Mother would not benefit from reunification services due to the severity of her mental illness.

The second psychological evaluation was conducted by Dr. Jamye Jesser, a licensed psychologist. Dr. Jesser's probable diagnoses for Mother were Delusional Disorder; Bipolar 1 Disorder, manic, severe; Generalized Anxiety Disorder; Unspecified Personality Disorder, Turbulent Disorder; Paranoid Personality Style; Compulsive Personality Style, Dependent Personality Type, and Attention Deficit Disorder. Dr. Jesser

7

did not recommend reunification between Mother and A.M. and did not recommend court services to Mother. Dr. Jesser explained that Mother did "not seem to have significant enough insight into her bipolar or delusional disorder, or insight enough into her toxic relationships."

The jurisdictional/dispositional hearing was held on March 27, 2026. The juvenile court found true the allegations in the second amended petition. The court found true that Mother had unresolved mental health issues and was not under the care of a doctor or seeking counseling or therapy, and that Mother had disclosed a family history of Schizophrenia and Bipolar Disorder. The court also found true that Mother had prior child welfare referral history of similar allegations of general neglect due to mental health issues in Riverside and Los Angeles Counties and had failed to benefit from services provided. The court further found true that Mother was unable or unwilling to provide the child with care and support and expressed that she could no longer care for him.

The court thereafter proceeded with the contested dispositional hearing. DPSS requested that Mother be denied services under section 361.5, subdivision (b)(2). Mother provided stipulated testimony. The stipulated testimony stated: "Mother would stipulate that she loves her child very much. She is enrolled in therapy. Mother is willing to work and improve on her mental health. And mother would like the opportunity to complete services to reunify with her . . . child." Mother's counsel argued that DPSS did not meet the burden to deny Mother services under section 361.5, subdivision (b)(2). Counsel also asserted that the two evaluators were not independent, as both shared the same office and that it was not appropriate for either evaluator to state that Mother should be denied

8

reunification services as the purpose of a psychological assessment is to determine if a parent would benefit from services. Counsel also pointed out that despite both psychological reports stating Mother should be denied services, both psychologists provide specific suggestions of what services should be provided to Mother to assist with her mental health.

Following argument by the parties, the juvenile court declared A.M. a dependent of the court, removed him from parental custody and denied reunification services to the parents. The court found clear and convincing evidence to deny Mother services under section 361.5, subdivision (b)(2). The court found no evidence that the psychologists discussed or shared any information, and it was not uncommon for several people to share office space. The court also noted that the psychological reports, while providing recommendations for services for Mother, were not meant to be for reunification purposes but were generally on how Mother should get help with her mental health. The court further found providing Mother with visitation was detrimental to A.M.'s well-being and denied Mother visitation.

On April 1, 2026, Mother filed a notice of intent to file writ petition.

III.

DISCUSSION

Mother contends that there was insufficient evidence to deny her reunification services under section 361.5, subdivision (b)(2). She also argues that granting her reunification services was in the best interest of the child. We are not persuaded by these arguments.

9

Dependency cases carry a presumption that parents will receive family reunification services. (§ 361.5, subd. (a).) The presumption "implements the law's strong preference for maintaining the family relationship if at all possible." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474; see § 202, subd. (a) ["reunification of the minor with his or her family shall be a primary objective"].) Nevertheless, "in certain situations, attempts to facilitate reunification do not serve and protect the child's interests." (*Baby Boy H.*, at p. 474.) Statutes authorizing the denial of reunification services are often referred to as "bypass" provisions. (*In re T.G.* (2015) 242 Cal.App.4th 976, 989.)

The bypass provision in section 361.5, subdivision (b)(2), is commonly referred to as the mental disability exception, and its application draws upon not only the subdivision itself but also section 361.5, subdivision (c)(1), and Family Code section 7827. Reunification services need not be provided if the court finds by clear and convincing evidence from any two experts " 'that a parent or parents suffer a mental incapacity or disorder that renders the parent or parents unable to care for and control the child adequately.' " (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880, quoting Fam. Code, § 7827, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*O.B.*); see section 361.5, subd. (b) [requiring clear and convincing evidence]; Fam. Cod § 7827, subd. (c) [requiring "the evidence of any two experts" to support a mental disability finding].) Additionally, section 361.5, subdivision (b)(2), requires a finding that the mental disability "renders the parent or guardian incapable of utilizing those services" and "subdivision (c) of section 361.5

10

speaks to the proof required under subdivision (b)(2) and provides in relevant part: 'When it is alleged . . . that the parent is incapable of utilizing services due to mental disability, the court shall order reunification services unless competent evidence from mental health professionals establishes that, even with the provision of services, the parent is unlikely to be capable of adequately caring for the child.' " (*In re Joy M.* (2002) 99 Cal.App.4th 11, 17.)

Section 361.5, subdivision (b)(2), incorporates the requirement specified in Family Code section 7827, subdivision (c), that a finding of mental disability be supported by " 'the evidence of any two experts,' " each of whom must be a psychiatrist or psychologist meeting educational and experience requirements. (*In re C.C.* (2003) 111 Cal.App.4th 76, 83-84.) But "there is no requirement that both experts must agree a parent is unlikely to benefit from services before the court may deny the parent services. Instead, the statute requires a showing only of evidence proffered by both experts regarding a parent's mental disability, evidence from which the court then can make inferences and base its findings." (*Curtis F. v. Superior Court* (2000) 80 Cal.App.4th 470, 474 (*Curtis F.*).)

We review the juvenile court's denial of reunification services under section 361.5, subdivision (b)(2) for substantial evidence. (*Curtis F.*, *supra*, 80 Cal.App.4th at p. 474.) We decide if the evidence is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the court's order was proper based on clear and convincing evidence. (*Ibid.*) In making this determination we do not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the

11

findings of the trial court. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589 (*Michael G.*).) "The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*Ibid*.)

We must "account for the clear and convincing standard of proof when addressing a claim that the evidence does not support a finding made under this standard," as we do here. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1011.) Nevertheless, our review is deferential to the juvenile court's role as the trier of fact: "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, at pp. 1011-1012.)

The evidence here was sufficient to support the juvenile court's finding that a mental disability rendered Mother unable to care for the child and unlikely to be capable of doing so even if she were provided with reunification services. (§ 361.5, subds. (b)(2), (c)(1).) The record shows that Mother suffered from a mental disability and that her mental disability rendered her incapable of utilizing services. After administering several psychological tests of Mother and reviewing Mother's statements and social and mental history, Dr. Garett provided probable diagnoses of Delusional Disorder, Bipolar 1

Disorder, possible attention deficit disorder with hyperactivity when the mother was younger. Dr. Garett recommended that providing Mother with reunification services at that time would not be appropriate and that offering reunification services may "further agitate her given that she is not presently in a position to regain custody." Dr. Garett later clarified that Mother would not benefit from reunification services due to the severity of her mental illness. Dr. Jesser also administered several psychological tests on Mother, reviewed her history and statements provided by Mother and DPSS, and listed probable diagnoses for Mother as Delusional Disorder; Bipolar 1 Disorder, manic, severe; Generalized Anxiety Disorder; Unspecified Personality Disorder, Turbulent Disorder; Paranoid Personality Style; Compulsive Personality Style, Dependent Personality Type, and Attention Deficit Disorder. Dr. Jesser reported that Mother did "not seem to have significant enough insight into her bipolar or delusional disorder, or insight enough into her toxic relationships." Dr. Jesser did not recommend reunification or court services to Mother.

Substantial evidence also shows that competent evidence from mental health professionals established that, even with the provision of services, Mother was unlikely to be capable of adequately caring for A.M. within the statutory time limits. Dr. Garett reported that Mother would not benefit from reunification services due to the severity of her mental illness and that offering services may further agitate Mother given she was not presently able to regain custody of A.M. Dr. Jesser opined that Mother should not receive court-ordered services given that she did not seem to have significant enough insight into her bipolar or delusional disorder or insight enough into her toxic relationships.

13

Mother argues the court's ruling is unsupported by sufficient evidence because the mental health providers' qualifications were not provided, the mental health providers did not testify and suggests their reports are suspect because the reports made similar findings. Mother's arguments essentially attack the credibility of the mental health providers. However, as noted above, we do not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589.) "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52.)

In addition, there is nothing in the record to indicate Mother requested that the mental health providers testify or objected to their qualifications or anything to indicate their psychological reports were suspect because they made similar findings. If a parent fails to object or raise an issue in the juvenile court, the parent is prevented from presenting the issue on appeal. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338-1339 (*Lorenzo C.*).) "[A] party is precluded from urging on appeal any point not raised in the trial court. [Citation.]" (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846.)

Mother asserts that she made reasonable efforts, pointing out her case from 2014 concerning A.Z., her successful competition of services in that case, and her reasonable efforts prior to the detention hearing in this matter. However, Mother never raised this issue in the court below and thus is precluded from raising it on appeal. (*Lorenzo C.*, *supra*, 54 Cal.App.4th at pp. 1338-1339.) In any event, whether or not Mother showed "reasonable efforts" is not a part of the analysis for determining whether or not

14

section 361.5, subdivision (b)(2), applies. Mother appears to be using language from section 361.5, subdivisions (b)(10) and (b)(11), because she cites two cases that analyze those subdivisions. Section 361.5, subdivisions (b)(10) and (b)(11), are not relevant to the instant matter.

Moreover, as part of the jurisdictional findings, the juvenile court found true that Mother failed to benefit from services provided. According to the record, after Mother received 12 months of reunification services while A.Z. was on family maintenance with her father, the matter was terminated with a family law order granting her father full physical custody and supervised visits for Mother. Given that Mother was awarded only supervised visitation, she did not successfully reunify with A.Z.

Mother contends that even if the section 361.5, subdivision (b)(2) bypass provision applies, the best interests of the child dictated that she should receive reunification services under section 361.5, subdivision (c). We reject this argument for several reasons.

First, the argument is forfeited. At the dispositional hearing, Mother did not make the argument she is now raising. "A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] Forfeiture, also referred to as 'waiver,' applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222.)

Moreover, even if not forfeited, the argument is not persuasive. Her argument rests on the premise that DPSS failed to prove that section 361.5, subdivision (b)(2),

15

applies. As discussed above, we reject that premise. As such, section 361.5, subdivision (c)(2), is inapplicable. Specifically, section 361.5, subdivision (c)(2), provides: "The court shall not order reunification for a parent or guardian described in paragraph (3), (4), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), or (17) of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." Section 361.5, subdivision (b)(2), is excluded from the purview of section 361.5, subdivision (c)(2). Where services are bypassed pursuant to section 361.5, subdivision (b)(2), it is section 361.5, subdivision (f), that applies. That subdivision requires only that the court determine if a hearing under section 366.26 shall be set, and if so, to conduct the hearing within 120 days after the dispositional hearing unless the other parent is receiving reunification services. (§ 361.5, subd. (f).) It does not require or authorize an inquiry into whether reunification would be in the best interests of the child, even though section 361.5, subdivision (b)(2), applies. (See *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1129 [" '[I]f the statutory language is not ambiguous, then we presume the Legislature meant what it said, and the plain meaning of the language governs.' "]; *In re David* (2012) 202 Cal.App.4th 675, 682 [" 'Appellate courts may not rewrite unambiguous statutes' " or "rewrite the clear language of [a] statute to broaden the statute's application"].) Mother has therefore failed to show error.

Ample evidence supports the juvenile court's decision to bypass reunification services pursuant to section 361.5, subdivision (b)(2).

IV.

DISPOSITION

The petition for an extraordinary writ is denied on the merits.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:


MILLER
Acting P. J.


RAPHAEL
J.